OPINION
{¶ 1} Michael Allen pled no contest to possession of crack cocaine, in an amount equal to or more than five grams but less than ten grams, after the Montgomery County Court of Common Pleas overruled his motion to suppress evidence. The trial court found him guilty, and *Page 2 
it sentenced Allen to one year in prison, suspended his driver's license for one year, and ordered him to pay a mandatory fine of $5,000 and court costs.
 {¶ 2} Allen appeals from the denial of his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.
 I {¶ 3} Dayton Police Detective James Mullins was the sole witness at the suppression hearing. His testimony established the following facts.
 {¶ 4} On September 24, 2007, Detective Mullins and his partner, Officer Rich Taylor, responded to a dispatch that a rape was in progress in the upper left apartment at 1771 Huffman Avenue in Dayton, Ohio. The address is a four-unit apartment building with two apartments on the first floor and two apartments on the second floor. The building has common entry doorways in both the front and the rear; these doors provide access to the apartments and interior stairs. After entering the front door, a stairway leads to the front door for each of the two upstairs apartments. Similarly, after entering the common rear entry door, another stairway leads to the back door for each of the two upstairs apartments.
 {¶ 5} Upon arriving at the scene, Detective Mullins proceeded to the common front entry door while Officer Taylor went to the rear entrance. Mullins observed that the front door to the building was standing open, and he saw a woman standing just outside the door. Mullins asked the woman if she was the person who had called for help. The woman replied that she was not, and she indicated that she lived in Apartment 1 on the first floor.
 {¶ 6} As Mullins was speaking with the woman, he saw another woman "suddenly pop[] out" of the upper left apartment, and he saw "hands come out of the door, almost like they *Page 3 
were pushing her out or giving her something which she came down with a purse." The woman quickly came down the steps, "the hands disappeared," and the door to the upper left apartment closed. Although the woman was in a hurry, nothing about her appearance indicated that she had been a victim of an assault. When the woman reached the bottom of the stairs, Mullins asked her if she had called the police for assistance. The woman said she had not. Mullins asked another officer who had arrived to talk with the woman further.
 {¶ 7} Mullins continued to have concerns that a rape victim might still be inside the upper left apartment, Apartment 3. He and another officer, Officer Hooper, proceeded to the front door of Apartment 3. Mullins knocked on the door very loudly and announced, "Dayton Police." When no one responded, Mullins knocked again, this time "so loudly and hard that the person in the apartment behind [him] opened his door."
 {¶ 8} After approximately a minute and a half, Louise Tamlyn answered the door. Mullins immediately recognized Tamlyn from two prior incidents — a hostage situation at Tamlyn's prior residence and a subsequent encounter at this location — 1771 Huffman Avenue-when an individual ran from Apartment 1 and hid from the police in Tamlyn's apartment. Mullins stepped inside Tamlyn's apartment, told her that he was there on a rape call, and immediately asked her if anybody else was there. Tamlyn said, "No." After asking her again, Tamlyn stated that her nephew, "Prez," might be there, and she gestured toward the back bedroom. About the same time, Officer Taylor contacted Mullins over the radio and told Mullins that he could see feet walking toward the back bedroom from under the rear door to the apartment.
 {¶ 9} Mullins went to the back bedroom and found that the door was locked. The *Page 4 
officer again knocked very loudly and very hard on the door, and announced, "Dayton Police." When no one answered, Mullins asked Tamlyn if she had key, but she claimed she did not. Mullins grabbed the door knob again, and he could feel someone else trying to turn the knob at the same time. When the door opened, Allen was standing in the doorway.
 {¶ 10} Mullins ordered Allen to the ground. Instead of complying, Allen lifted his hands and asked, in a confrontational way, "What the fuck's going on?" Mullins put Allen on the floor, placed his hands behind his back, and secured him with handcuffs. Mullins explained that he was concerned that Allen might be armed due to the violent nature of a rape, and he believed that the victim might still be in the room. While other officers searched the room, Mullins did a patdown search for weapons. He felt a large wad of cash on the outside of Allen's pockets and a rock of crack cocaine protruding from Allen's buttocks. Mullins put on a rubber glove and retrieved the crack cocaine from Allen.
 {¶ 11} On October 2, 2007, Allen was indicted with possession of crack cocaine in an amount equal to or more than five grams but less than ten grams, in violation of R.C. 2925.11(A), and possession of drug paraphernalia, in violation of R.C. 2925.14(C)(1). Allen subsequently moved to suppress the evidence on the ground that his detention, the search, and the seizure of evidence violated his Fourth Amendment rights.
 {¶ 12} After a hearing on the motion to suppress, the trial court credited Mullins' testimony and it orally overruled the motion. Initially, the court concluded that the officers' warrantless entry into the apartment was lawful. The court noted that there was no evidence that Allen had any expectation of privacy in the apartment and, regardless, exigent circumstances justified the officers' entry. Next, the court found that the officer reasonably detained Allen in *Page 5 
handcuffs, and it noted that placing Allen in handcuffs did not convert the detention into an arrest. The court further concluded that Mullins had a reasonable basis to perform a patdown for weapons, even though Allen was handcuffed at that time. Finally, the court concluded that Mullins' identification of the crack cocaine fell under the "plain feel" doctrine and he therefore lawfully seized the crack cocaine from Allen.
 {¶ 13} On January 18, 2008, the trial court filed a written decision and entry, overruling the motion to suppress for the reasons stated orally on the record.
 {¶ 14} Allen appeals, raising one assignment of error.
 II {¶ 15} Allen's sole assignment of error states:
 {¶ 16} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS PHYSICAL EVIDENCE GAINED AGAINST APPELLANT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS PURSUANT TO THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS COMPARABLE PORTIONS OF THE OHIO CONSTITUTION."
 {¶ 17} Allen asserts that he was subj ected to an unreasonable search and seizure in three respects. First, he claims that Detective Mullins lacked a reasonable and articulable suspicion that he (Allen) was engaged in criminal activity to justify detaining him. Second, Allen asserts that Mullins was not justified in conducting a patdown for weapons. Third, Allen claims that Mullins exceeded the scope of a permissible patdown by "going up *** his butt crack." As discussed below, none of these arguments has merit.
 {¶ 18} In reviewing the trial court's ruling on a motion to suppress evidence, this *Page 6 
court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. See State v. Morgan, Montgomery App. No. 18985, 2002-Ohio-268. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." Id.
 {¶ 19} As an initial matter, Allen does not appear to argue that the trial court erred in concluding that the officers lawfully entered the apartment. However, based on the record, we would agree with the trial court's conclusion that Allen had no basis for objecting to the officers' warrantless entry. In order for Allen to challenge the officers' entry into Tamlyn's apartment on the ground that the officers violated his Fourth Amendment rights, he was required to establish that he had a subjectively and objectively reasonable expectation of privacy in the apartment. Rakas v. Illinois (1978), 439 U.S. 128, 133-34,99 S.Ct. 421, 58 L.Ed.2d 387; State v. Williams (1995), 73 Ohio St.3d 153,166. Allen presented no evidence that he had any such expectation of privacy in the apartment. Accordingly, Allen failed to demonstrate that he suffered a violation of his Fourth Amendment rights when the officers entered the apartment without a warrant. Because Allen lacked a reasonable expectation of privacy in the apartment, we need not address whether the officers' entry was also justified under the emergency circumstances exception to the warrant requirement.
 {¶ 20} Allen claims that the officers lacked a reasonable suspicion that he was engaged in criminal activity to warrant detaining him. We disagree.
 {¶ 21} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and seizures. Terry v. Ohio (1968), 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Page 7 Terry, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable and articulable suspicion that the person is engaged in criminal activity. State v. Martin, Montgomery App. No. 20270, 2004-Ohio-2738, at ¶ 10, citing Terry, supra; State v.Molette, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. This is so even if the officers lack probable cause to make an arrest. Id. "Reasonable suspicion entails some minimal level of objective justification for making a stop — that is, something more than an inchoate and unparticularized suspicion or `hunch,' but less than the level of suspicion required for probable cause." State v. Jones (1990),70 Ohio App.3d 554, 556-557, citing Terry, 392 U.S. at 27.
 {¶ 22} We determine the existence of "reasonable suspicion" by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v.Heard, Montgomery App. No. 19323, 2003-Ohio-1047, at ¶ 14, quotingState v. Andrews (1991), 57 Ohio St.3d 86, 87-88. An individual is subject to an investigatory detention when, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions.United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870,64 L.Ed.2d 497; Terry, 392 U.S. at 16, 19.
 {¶ 23} Upon review of the record, Detective Mullins had a reasonable and articulable suspicion that Allen was engaged in criminal activity when he detained Allen. At that point, Mullins had responded to a call of a rape in progress in the apartment where Allen was found. He had seen a woman apparently being pushed *Page 8 
out of Apartment 3, although she did not appear to be a victim of a sexual assault. When Mullins announced himself and knocked very loudly and hard on the apartment door, a significant delay occurred before Tamlyn answered the door. Mullins had had previous dealings with Tamlyn, including incidents involving a hostage situation in her apartment and an individual hiding from the police in her apartment. Upon questioning, Tamlyn initially denied that anyone else was present in the apartment. Officer Taylor, however, informed Mullins that he could see someone walking in a back hallway toward the back bedroom. When Tamlyn later admitted that her nephew might be present, Mullins found the door to the room where Allen was located to be locked. Given the nature of the dispatch, the delay in responding to his "knock and announce," Tamlyn's untruthfulness about Allen's presence, and the fact that Allen appeared to be hiding in the bedroom after the officers entered, Detective Mullins reasonably suspected that Allen was engaged in criminal activity when he detained Allen in the bedroom.
 {¶ 24} Next, Allen claims that Detective Mullins lacked a reasonable suspicion that he was armed to justify a search for weapons.
 {¶ 25} Once a lawful stop has been made, the police may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. Molette, at ¶ 13. To justify a patdown underTerry, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably *Page 9 
prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27; State v.Smith (1978), 56 Ohio St.2d 405, 407.
 {¶ 26} Based on the totality of the circumstances, we agree with the trial court that Mullins reasonably believed that Allen might be armed or a danger to the officers. The officers were dispatched on a rape in progress, a crime of violence which could involve a weapon. The officers reasonably inferred that Allen seemed to be trying to hide within the apartment, and Mullins testified that Allen had a confrontational manner when he opened the bedroom door. In our view, it was reasonable for Mullins to frisk Allen for weapons for his own safety and that of the other officers.
 {¶ 27} Our conclusion is not altered by the fact that Allen was handcuffed when the patdown occurred. Mullins testified that it was possible for an individual to access a weapon on his person, even if the person were in handcuffs. He explained: "I've had people reach in the pockets in front of themselves, your Honor, with their hands handcuffed behind their backs. So, yeah, it's possible to reach a weapon many places on his body, even standing up." Mullins indicated that Allen's hands had been handcuffed behind his back, so Allen could "very directly reach his buttocks area." Accordingly, Mullins reasonably conducted a limited patdown search for weapons, despite the fact that Allen was handcuffed.
 {¶ 28} Finally, Allen claims that the patdown exceeded the permissible scope of a patdown for weapons. Specifically, Allen states that Detective Mullins' patdown "exceeded the permissible scope ofTerry when Detective Mullins `went up his butt crack' with his hand between the cleavage of Appellant's buttocks."
 {¶ 29} Because a frisk under Terry is justified "solely by the protection of the *Page 10 
police officer or others nearby, *** it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." State v. Woodward, Montgomery App. No. 18869, 2002-Ohio-942, quoting Terry, 392 U.S. at 29. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." State v. Dickerson, Montgomery App. No. 22452, 2008-Ohio-6544, ¶ 20, quoting Adams v.Williams (1972), 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612.
 {¶ 30} During direct examination, Mullins testified that, based upon his experience and training, a person's buttocks area is a location where someone could conceal a weapon. Mullins stated that, although he had not personally found weapons in that area, he had known other officers "to experience weapons there." Moreover, because Allen's hands had been handcuffed behind his back, Allen could have been able to reach a weapon placed in the back of his pants.
 {¶ 31} Contrary to Allen's assertion that Mullins "went up [Allen's] butt crack," Mullins testified that he patted down the exterior of Allen's clothing, and he denied searching between the cheeks of Allen's buttocks. Mullins testified during cross-examination, as follows:
 {¶ 32} "[DEFENSE COUNSEL]: Okay. And then you immediately moved to his posterior and reached up his butt crack to search for drugs?
 {¶ 33} "[DET. MULLINS]: No. There was a — I checked his waistline for weapons at that time as well, and then I did move to his rear end, yes.
 {¶ 34} "[DEFENSE COUNSEL]: Okay. But I mean you actually reached up into *Page 11 
the crack area of his buttocks, correct?
 {¶ 35} "[DET. MULLINS]: My initial feel was just a pat on the outside of the clothes up the butt, and I could feel it at that time. And then I did reach in there to grab it, yes.
 {¶ 36} "[DEFENSE COUNSEL]: Okay, but in your earlier testimony, before you put the rubber gloves on, didn't you say you actually reached up his butt crack? Did I mishear you?
 {¶ 37} "[DET. MULLINS]: I don't think I said I reached up his butt crack. I patted down his butt crack, yes.
 {¶ 38} "[DEFENSE COUNSEL]: Okay. Which does involve something more than just peripherally touching the buttocks area, true?
 {¶ 39} "DET. MULLINS: No, not in this particular case, it does not.
 {¶ 40} "***
 {¶ 41} "[DEFENSE COUNSEL]: Okay. And the crack cocaine that you found in his anal cavity, the bag wasn't protruding to the point where it would've stuck out a-outside of his buttocks area, was it?
 {¶ 42} "[DET. MULLINS]: The actual rock was protruding where it was stuck out. Not that you could see it with the naked eye to look, but all you had to do is just put your hand on it (indicating) and you feel it sticking out.
 {¶ 43} "[DEFENSE COUNSEL]: That didn't require you to reach between the cheeks of his buttocks.
 {¶ 44} "[DET. MULLINS]: It didn't require me to reach between them, no. It was an outside pat of the buttocks." *Page 12 
 {¶ 45} We have, on several occasions, expressed concern over the intrusiveness of a search of the area between an individual's buttocks. E.g., State v. Barnett, Montgomery App. No. 21619, 2007-Ohio-3694, ¶ 19;State v. Mackey (2001), 141 Ohio App.3d 604. Trial courts should view such situations closely, if not skeptically. However, Mullins' testimony, which was credited by the trial court, established that his search of Allen did not rise to that level of intrusiveness. Mullins' search for weapons was limited to the exterior of Allen's clothing, and Mullins did not search between the crack of Allen's buttocks. Based on the record, Mullins' patdown did not exceed the permissible scope of aTerry patdown.
 {¶ 46} Finally, Allen has not challenged the trial court's conclusion that Detective Mullins' seizure of the crack cocaine was lawful under the "plain feel" doctrine. Even if Allen had raised such an argument, we would agree with the trial court. Under the plain feel doctrine, an officer conducting a patdown for weapons may lawfully seize an object if he has probable cause to believe that the item is contraband.Minnesota v. Dickerson (1993), 508 U.S. 366, 375, 113 S.Ct. 2130,124 L.Ed.2d 334; State v. Phillips, 155 Ohio App.3d 149, 2003-Ohio-5742, ¶ 41-42. The officer may not manipulate the object to identify the object or to determine whether it is contraband; instead, the "incriminating character" of the object must be "immediately apparent." Id. Here, the trial court's conclusion was supported by Mullins' unrefuted testimony that he did not manipulate the object and that he immediately identified the object protruding from Allen's buttocks as a rock of crack cocaine.
 {¶ 47} Based on the record, the trial court properly concluded that the police lawfully seized the crack cocaine from Allen. Consequently, the trial court did not err in *Page 13 
denying Allen's motion to suppress evidence.
 {¶ 48} We note that the State has asserted that, even if Detective Mullins had exceeded the permissible scope of a patdown, we may affirm the trial court's judgment on the ground that Allen lacked a reasonable expectation of privacy due the existence of two outstanding warrants for his arrest. See Dayton v. Click (Oct. 5, 1994), Montgomery App. No. 14328. Because we, like the trial court, conclude that the police lawfully detained and frisked Allen, leading to the lawful seizure of the crack cocaine, we need not address the State's alternative argument.
 {¶ 49} Allen's sole assignment of error is overruled.
 III {¶ 50} Having overruled the assignment of error, the judgment of the trial court will be affirmed.
DONOVAN, P.J. and GRADY, J., concur. *Page 1